Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7998 | **DATE** | 2/17/2004 |
| **CASE TITLE** | Bradich vs. City of Chicago, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Before the Court are the Individual Defendants' Motion for Summary Judgment [72-1], the City of Chicago's Motion for Summary Judgment [76-1], and Plaintiff's Motion for Partial Summary Judgment [69-1]. For the reasons stated in the attached order, Defendants' motions [72-1] [76-1] are GRANTED in part and DENIED in part; Plaintiff's motion [69-1] is DENIED as moot. The Clerk shall enter judgment pursuant to Rule 58 for all Defendants on Counts I-VI of Plaintiff's Second Amended Complaint. Because the court dismisses all federal claims, it relinquishes pendant jurisdiction over any and all of the Estate's state tort claims. See 28 U.S.C. § 1367; see also ISI Intern., Inc. v. Borden Ladner Gervais LLP, 316 F.3d 731, 733 (7th Cir. 2003); Gonzalez v. City of Chicago, 239 F.3d 939, 942 (7th Cir. 2001). (See Attached Opinion and Order.)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| ☐ | No notices required, advised in open court. | | |
| ☐ | No notices required. | number of notices | |
| ☐ | Notices mailed by judge's staff. | | |
| ☐ | Notified counsel by telephone. | FEB 19 2004 date docketed | |
| ✔ | Docketing to mail notices. | | 102 |
| ✔ | Mail AO 450 form. | docketing deputy initials | |
| ☐ | Copy to judge/magistrate judge. | | |
| | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office    mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DELORES BRADICH, on her own behalf, )
as survivor of MELVIN BRADICH, deceased, )
and as Administrator of the Estate of MELVIN )
BRADICH, )
)
    Plaintiff, )    Case No. 00 C 7998
)
v. )    Honorable Charles R. Norgle
THE CITY OF CHICAGO, a municipal )
corporation, CAPTAIN DONALD HILBRING, )
DETECTIVE JOHN HROMA, DETECTIVE )
JAMES BAKER, POLICE OFFICER RONALD )
SIMMONS, and DETENTION AIDE CRAIG )
WALKER, )
)
    Defendants. )

**DOCKETED**

FEB 1 9 2004

## OPINION AND ORDER

Charles R. Norgle, District Judge.

Before the Court are Defendants' Motions for Summary Judgment[1] and Plaintiff's Motion for Partial Summary Judgment, all brought pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendants' motions are granted in part and denied in part; Plaintiff's motion is denied as moot.

---

[1] The individual Defendants have collectively filed their Motion for Summary Judgment, while the City of Chicago has filed its own Motion for Summary Judgment. The court addresses both of these motions in this order.

1

102

## I. INTRODUCTION

On October 23, 1999, Melvin Bradich was arrested by members of the Chicago Police Department ("Police Department"). Shortly after his arrest, Bradich committed suicide in the Police Department's 4th District lockup.

On October 19, 2000, Melvin's mother, Delores Bradich, filed a Complaint as Administrator of Melvin's Estate (the "Estate") in the Circuit Court of Cook County, Illinois, against the City of Chicago ("City") and several individual members of the Police Department. The Estate's Complaint alleged, among other things, violations of 42 U.S.C. § 1983. On December 21, 2000, Defendant City removed the Estate's Complaint to this court. On October 11, 2002, after two years of discovery, the Estate filed its Second Amended Complaint once again alleging, among other things, violations of 42 U.S.C. § 1983. Essentially, the Estate alleges that both the City and the individual Defendants violated Melvin Bradich's Fourteenth Amendment due process rights by acting with deliberate indifference to his health and well-being while he was in the Police Department's custody.

## II. UNDISPUTED FACTS[2]

Prior to October 23, 1999, Bradich, who had a history of alcohol and drug abuse, had been arrested twenty-three times by members of the Chicago Police Department. There is no record of Bradich ever attempting suicide during any of these arrests, or that family members or anyone else advised appropriate law enforcement officials that there was a risk of suicide.

On October 23, 1999, at approximately 3:00 p.m., Police Officers John Hroma and James Baker observed Bradich on the street at 11144 S. Greenbay Ave., in Chicago, Illinois. After

---

[2]The undisputed facts are taken from the Parties' Local Rule 56.1 Statements. All disputed facts are noted in text and construed in the light most favorable to the non-moving party. See Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995).

conducting an investigation, Hroma and Baker arrested Bradich, who was the subject of an outstanding arrest warrant for driving under the influence ("DUI Warrant"). Upon searching Bradich, Officers Hroma and Baker discovered that he was in possession of a controlled substance. Specifically, Bradich possessed a barbituate called Alprozolam (commercially sold as Xanax).

Although it is unclear as to what time Bradich arrived at the 4th District police station, it is undisputed that Officer Hroma delivered Bradich to the district's lockup facility at approximately 5:00 p.m. At this time, Police Officer Ronald Simmons and Detention Aide Craig Walker were the only two members of the Police Department assigned to the lockup facility. Officer Hroma did not communicate to Simmons or Walker that Bardich was a heroin addict or that he needed any special attention. Upon accepting custody of Bradich, Aide Walker proceeded to search him. Determining that Bradich was intoxicated and unable to hold still long enough to be fingerprinted, Walker escorted Bradich to a cell located within one of the lockup facility's cell blocks.[3] The officers placed Bradich in a cell which could be viewed from a video monitor.

After Bradich was placed in his cell, arrestee Calvin Stinson entered the lockup for processing. Stinson, who estimates that he was in the lockup for approximately ten minutes, observed several officers in the lockup playing cards and watching television. Stinson did not report any other relevant observations or any unusual behavior regarding his visit to the lockup. It is also undisputed that Thomas Osborne, who was in the cell adjacent to Bradich's cell, did not report any unusual behavior by Bradich prior to the hanging.

Some time after Stinson left the lockup, Officer Simmons and Aide Walker observed Bradich on the video monitor hanging from the bars of his cell. Simmons and Walker immediately ran to

---

[3] The parties dispute whether Bradich needed physical assistance to get to his cell.

Bradich's cell and attempted to free him from his ligature. When Bradich was freed from his ligature, he appeared to be alive. At some time thereafter, Aide Walker ran to the front desk of the station to summon an ambulance. Additionally, Captain Donald Hilbring, the 4th District's Watch Commander on duty at the time, arrived in the lockup to assist Simmons and Walker. Chicago Fire Department paramedics Donna Parrott and Russell Lane were assigned to respond to Bradich's suicide attempt at approximately 6:25 p.m. Prior to their arrival, unidentified firefighters from Chicago Fire Department Engine Company 81 arrived on the scene. When Parrot and Lane arrived, Melvin Bradich was dead.

### III. DISCUSSION

#### A. Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of

4

inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When the defendant moves for summary judgment, the court must view the record and all inferences in a light most favorable to the plaintiff. Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003); Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). This includes evidence provided in the plaintiff's self-serving affidavit, provided such evidence is admissible at trial. Payne, 337 F.3d at 773. However, the inferences construed in the plaintiff's favor must be drawn from specific facts identified in the record that support the plaintiff's position. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922-23 (7th Cir. 1994). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, No. 02-3373, -- F.3d --, 2003 U.S. App. LEXIS 7921, at *11 (7th Cir. April 25, 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

### B. Qualified Immunity

Individual government officials sued under § 1983 may assert the defense of qualified immunity. See generally Saucier v. Katz, 533 U.S. 194 (2001). This defense protects "government agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Knox v. Smith, 342 F.3d 651, 657 (7th Cir. 2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To determine whether an official is entitled to the defense of qualified immunity, the court must undertake a two-step inquiry. See Saucier, 533 U.S. at 2156. The first step is to determine

whether the facts, when taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. See id. at 201; see also Knox, 342 F.3d at 657. If the plaintiff presents a constitutional injury, the second step is to determine whether the right was clearly established at the time. See id. The second step "must be undertaken in light of the specific context of the case, not as a general proposition...." Id. "[T]he right allegedly violated must be defined at an appropriate level of specificity before a court can determine if it was clearly established." Id. at 202 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct...." Saucier, 121 S. Ct. at 2158. "If the [official's] mistake as to what the law requires is reasonable ... the [official] is entitled to the immunity defense." Id.

In this case, all individual Defendants assert that they are entitled to the defense of qualified immunity. Because the Estate's § 1983 claims differ as to some of the individual Defendants, the court will analyze the qualified immunity defenses in two sections. First, it will address the Estate's claims that certain Defendants violated Melvin Bradich's Fourteenth Amendment due process rights by acting with deliberate indifference to his serious risk of suicide prior to discovering the hanging. Second, the court will address the Estate's claims that certain Defendants violated Melvin Bradich's Fourteenth Amendment due process rights by acting with deliberate indifference to his serious medical needs after discovering the hanging.

*1. Suicide Risk Prior to Discovery of Prisoner Hanging*

Under § 1983, a pre-trial detainee establishes a violation of the Fourteenth Amendment by demonstrating: (1) the defendants were aware of a substantial risk of serious injury to the detainee; and (2) the defendants acted with deliberate indifference to the known danger. Cavalieri v. Shepard,

6

321 F.3d 616, 620 (7th Cir. 2003); Payne for Hicks v. Churchich, 161 F.3d 1030, 1041 (7th Cir. 1998). Under the first prong of this inquiry, the issue in suicide prevention cases is whether the government official subjectively knew that the detainee was going to commit suicide. See Matos ex rel Matos v. O'Sullivan, 335 F.3d 553, 557 (7th Cir. 2003) (stating that a plaintiff must show that the defendant had actual knowledge of the detainee's risk of suicide); see also Cavalieri, 321 F.3d at 620. Although knowledge can be inferred from the obviousness of the risk, see Payne, 161 F.3d at 1042, the standard requires a strong likelihood, rather than a mere possibility, that suicide would occur. See id. (stating that plaintiff must show facts which impute subjective knowledge of a high suicide risk to jail personnel) (quotations omitted); see also Estate of Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001) (holding that defendant's must be aware of the likelihood that the detainee posed a "genuine suicide risk.").

Once the plaintiff establishes that the official was aware of the detainee's substantial risk of suicide, the court must consider, under the second prong of the analysis, whether he acted with deliberate indifference to the known risk. See Matos, 335 F.3d at 557; see also Payne, 161 F.3d 1041. This requires the plaintiff to show that each individual defendant intentionally disregarded that risk. Matos, 335 F.3d at 557. Because criminal recklessness is a proxy for intent, only intentional or criminally reckless conduct amounts to deliberate indifference. Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991). Thus, the plaintiff is required to show more than mere or gross negligence – but less than purposeful infliction of harm – on behalf of the government official. See Matos, 335 F.3d at 557.

In this case, the Estate argues that Defendants Hroma, Baker, Simmons and Walker, through their deliberate indifference to Bradich's risk of suicide, violated his right to receive adequate

supervision and care during his confinement. Put another way, the Estate argues that based on the circumstances, these individual Defendants should have known that Bradich was likely to commit suicide and failed to provide adequate measures to prevent the occurrence. The court will first address the Estate's claims against the arresting officers, Hroma and Baker. It will then address the Estate's claims against the lockup personnel, Simmons and Walker.

### *(a) Officers Hroma and Baker*

The parties do not dispute that Melvin Bradich had no known history of suicidal thoughts or tendencies prior to his arrest on October 23, 1999. However, the Estate argues that based on the specific circumstances presented to the arresting officers on the day of the decedent's arrest, his significant risk of suicide was obvious. See Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., at 17. To support this assertion, the Estate argues that Officers Hroma and Baker witnessed the decedent's emotional and physical collapse while in their custody. Specifically, the Estate argues that by the time the decedent arrived at the lockup, he was incoherent, unable to walk without assistance, unable to cooperate in the fingerprinting process and distressed. See id. at 18.

The evidence, however, when construed in the light most favorable to the Estate, does not support this claim. Bradich was drinking alcohol and possibly using heroin prior to his arrest. Assuming that he was in fairly good physical condition and oriented as to time and place at the time of his arrest, the Estate presents no admissible evidence which shows that his condition had deteriorated to such a level that would make a significant risk of suicide obvious to these officers. For example, the Estate relies on evidence showing that Bradich was incoherent when he entered the lockup at approximately 5:00 p.m. Even if true, this is not enough to infer a known risk of suicide. See Estate of Hocker by Hocker v. Walsh, 22 F.3d 995, 1000 (10th Cir. 1994) (holding that

intoxication with its accompanying incoherence does not, by itself, infer knowledge of a significant suicide risk to a prison official); see also Payne, 161 F.3d at 1042 (holding that intoxication and frequent cursing are not enough to establish a subjectively known risk of suicide).

The Estate also argues that Bradich was unable to walk without assistance and distressed at the time he entered the lockup. However, there is no admissible evidence to support either contention. The only evidence suggesting that Bradich could not walk without assistance is the deposition testimony of Michael Bradich, the decedent's brother. Michael Bradich testified that Officer Harold Hanley told him he observed the decedent when he entered the police station and that he was being held up by the arresting officers. In his deposition, Officer Hanley did not recall saying this to Micheal Bradich. Thus, this statement is inadmissible hearsay and is not to be considered in a motion for summary judgment. See Fed. R. Evid. 801(c); see also Bombard, 92 F.3d at 562.

Similarly, to show that the decedent was distressed, the Estate relies on evidence suggesting that Officers Hroma and Baker took Bradich to his home after the arrest for the purpose of using him as a "snitch" in a drug sting operation. The Estate argues that these officers forced Bradich to call and set up a drug dealer in exchange for his release. Even if true, there is no evidence to support the theory that Bradich was distressed as a result of his own intentional conduct after deciding to cooperate with the officers. See Alexander v. DeAngelo, 329 F.3d 912, 918 (7th Cir. 2003) (noting that confidential informants often engage in risky undercover work in exchange for leniency, including the risk of being "bumped off by a drug dealer with whom one is negotiating a purchase or sale of drugs . . ."). Although Robert Bradich testified that Melvin Bradich was previously concerned about police officers pressuring him to give up a "crack house," there is no evidence

9

showing that Officers Hroma and Baker knew of this pressure, or that Melvin Bradich was contemplating suicide as a result. See Pl.'s Ex. 41, at 59-61.

Additionally, the Estate argues that because Melvin Bradich was unable to cooperate in the fingerprinting process, Officers Hroma and Baker should have known of Bradich's substantial risk of suicide. Detention Aide Walker testified that while searching Bradich, he determined that Bradich was not steady enough to be fingerprinted. In doing so, Walker decided not to fingerprint Bradich before placing him in a cell. Assuming this is true, this evidence shows at most that Bradich was too intoxicated to be fingerprinted at the time Officers Hroma delivered him to the lockup. It does not show that Bradich was a substantial risk of suicide. See Payne, 161 F.3d at 1042 (holding that intoxication is not enough to establish a known risk of suicide).

Additionally, the Estate argues that Officers Hroma and Baker's denial of using Bradich in a sting operation, despite evidence to the contrary, evidences of a cover-up showing that they were aware of Bradich's significant risk of suicide. See Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., at 20. Even assuming that Hroma and Baker did use Bradich in an attempted sting operation, and that they lied about it after the fact, this still does not show that they were aware of a substantial risk of suicide in this case. Although this evidence when construed most favorably to the Estate may show that these officers are attempting to hide wrongdoing, it in no way shows that they were aware of a substantial risk of suicide prior to Melvin Bradich's death. See Mathis v. Fairman, 120 F.3d 88, 91 (7th Cir. 1997) (stating that a violation of departmental procedure, by itself, is not enough to show a subjectively known risk of suicide).

Finally, even assuming that everything the Estate claims regarding the condition of Melvin Bradich prior to entering the lockup is true, the Estate still has not met its burden of showing that

Officers Hroma and Baker were aware of a substantial risk of suicide. Assuming the decedent's emotional and physical condition had deteriorated significantly while he was in their custody, absent knowledge of a history of suicide attempts or any indication that Bradich was suicidal on the day of his arrest, knowledge of a significant suicide risk cannot be inferred from the circumstances of this case. See Camic, 712 F.2d at 1146 (holding that "[k]nowing [the decedent] was behaving violently, or in a 'freaky' manner is not synonymous with having reason to know that the violence might become self-directed.") (emphasis in original); see also Brooks v City of Chicago, No. 88-8609, 1992 WL 373034, at *4 (N.D. Ill. Dec. 8, 1992) (holding that absent the intention to commit suicide, "the fact that [the decedent] was acting belligerent and intoxicated is not synonymous with having reason to know that he was suicidal.").

Therefore, based on all of the reasons stated above, the evidence does not show that Officers Hroma and Baker were aware of a substantial risk of suicide. As such, the Estate fails to show that these officers committed a Constitutional violation by being deliberately indifferent to the decedent's known risk of suicide. See Matos, 335 F.3d at 557 (requiring subjective knowledge of a suicide risk to prevail on a claim under § 1983). Absent such a showing, the court need not consider the second prong of Officer Hroma and Baker's qualified immunity defense, and these Defendants are entitled to summary judgment on the Estate's § 1983 claims. See Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001).

### (b) Officer Simmons and Detention Aide Walker

The Estate also argues that Officer Simmons and Detention Aide Walker knew of Melvin Bradich's significant risk of suicide when he entered the lockup and failed to take any steps to limit this risk. See Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., at 21. Specifically, the Estate

11

asserts that the decedent was clearly intoxicated, incoherent, physically incapacitated and distressed upon arrival to the lockup. See id. at 21-22. The court has already determined that the evidence in this case only shows at most that the decedent was intoxicated and incoherent at the time he entered the lockup.[4] See Part III.B.1.(a). This is not enough to show a known risk of suicide. See Hocker, 22 F.3d at 1000. However, even if the court were to assume that everything the Estate argues here is true, it still is not enough to infer knowledge of the decedent's significant risk of suicide to Officer Simmons or Aide Walker. Absent a showing of a history of suicide attempts or any indication that Melvin Bradich was suicidal on the day of his arrest, knowledge of such a risk cannot be inferred from the circumstances. See Camic, 712 F.2d at 1146; see also Brooks, 1992 WL 373034, at *4.

Similarly, the Estate focuses on evidence which it claims shows that Simmons and Walker altered evidence and gave inconsistent versions of the events to support its claim that these individuals had knowledge of Bradich's substantial risk of suicide. See Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., at 22-24. The court need not determine whether the evidence supports these claims because, even if true, these acts do not show that these Defendants had knowledge of Bradich's substantial risk of suicide. See Mathis, 120 F.3d at 91 (emphasizing that violations of departmental procedures are not enough to show a subjectively known risk of suicide). At most this evidence, if true, shows that Simmons and Walker were attempting to hide some wrongdoing on their part. However, it does not show that they knew Bradich was a substantial suicide risk prior to placing him in his cell. See Brooks, 1992 WL 373034, at 4 (stating that even if the defendants

---

[4] Although the evidence shows that Simmons stated that Bradich was "incoherent" when he entered the lockup, the evidence also supports the fact that Bradich had the capacity to ask Officer Simmons a question regarding the nature of his charges and to answer his other questions. See Individual Defs.' Mot. for Summ. J., Ex. C, at 43; see also Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., Ex. 9, at 3.

violated one or more of their established procedures, absent subjective knowledge of the decedent's suicidal intentions, their actions do not constitute a deliberate disregard of a possibility that the decedent would take his own life).

*2. Medical Needs After Discovery of Prisoner Hanging*

The Estate also argues that Captain Hilbring, Officer Simmons and Aide Walker were deliberately indifferent to Melvin Bradich's serious medical needs after they discovered the suicide attempt. With regard to this issue, a pretrial detainee's due process rights are violated when an official is deliberately indifferent to the serious medical needs of the detainee. Estelle v. Gamble, 429 U.S. 497, 106 (1976); Salazar, 940 F.2d at 238. A plaintiff cannot establish a § 1983 claim based upon inadequate medical care when the care provided is merely negligent. Estate of Cole By Pardue v. Fromm, 94 F.3d 254, 259 (7th Cir. 1996). In other words, the officer only deprives the pretrial detainee of his due process rights if he intends for him to die or suffer grievously, or if the officer knows of a significant risk that the detainee will die or suffer grievously but is indifferent to that risk. Rapier v. Harris, 172 F.3d 999, 1006 (7th Cir. 1999); Salazar, 940 F2d. at 238.

In this case, there is no dispute that when the lockup personnel discovered Melvin Bradich hanging in his cell, he was in serious need of medical treatment. Thus, the issue before the court is whether the individual Defendants acted with deliberate indifference to Bradich's serious need. See Salazar, 940 F.2d at 238. The Estate argues that Hilbring, Simmons and Walker acted with deliberate indifference to Bradich's serious medical need by failing to promptly summon medical assistance after discovering the decedent hanging in his cell. In support of its claim, the Estate focuses primarily on two facts. First, it contends that the individual Defendants have judicially admitted that the time of discovery was approximately 6:15 p.m. Second, the Estate asserts that

13

although it took only "seconds to free the Decedent from his ligature," see Pl.'s Resp. to Individual Defs.' Mot. for Summ. J., at 31, an ambulance was not summoned until approximately 6:24 p.m. See Second Am. Compl. ¶ 72. Thus, the Estate argues that Defendants' approximate nine minute delay in summoning an ambulance is evidence of deliberate indifference to the decedent's serious medical needs.

The court rejects the Estate's argument. Even construing the evidence in favor of the Estate, there is no evidence in the record that shows that these Defendants acted with deliberate indifference to the decedent's serious medical needs. To the contrary, the record is replete with evidence showing that the Defendants acted diligently in attempting to assist the decedent upon discovering him hanging in his cell. Although there are some inconsistencies in the testimony of the individual Defendants regarding exactly who did what and when, these inconsistencies are not material to the issue at hand.

The evidence clearly shows that upon discovering Bradich hanging in his cell, both Officer Simmons and Aide Walker immediately ran to his cell block to assist him. When Simmons and Walker arrived at the cell, they were unsuccessful in their attempts to untie the ligature. Additionally, they were unable to open the cell door because Bradich had tied the ligature in such a way which prevented them from doing so. The evidence also shows that either Simmons or Walker then ran to the kitchen to get a knife. When one of these Defendants returned with the knife, both Defendants individually attempted to cut the ligature. At some point while this was occurring, Captain Hilbring entered the lockup. Simmons eventually cut Bradich free from his ligature and removed it from his neck. The evidence also shows that Walker ran to the front desk to summon an

ambulance. At some point prior to the arrival of the Firefighters, Captain Hilbring confirmed that an ambulance was summoned.

The Estate's contention that the evidence shows it only took the Defendants "seconds to free the Decedent from his ligature . . ." is not supported by the record. Rather, the evidence shows that the Defendants worked diligently to free Bradich from his ligature, an effort that took numerous attempts and undoubtedly much more time than a few seconds.

Moreover, although the Estate argues that there was an inexplicable nine minute delay in summoning medical assistance, see Second Am. Compl. ¶ 72, it does not deny that these times are at best estimates. Although the paramedics believe they received the assignment at approximately 6:25 p.m., the Estate offers little evidence to show that help was not summoned prior to that time. There is no evidence showing that the call was dispatched immediately after it was received at the call center. Additionally, paramedic Donna Parrott testified that she relies on several clocks when working in the ambulance, and that her watch is set about three minutes ahead of the dispatcher's clock. See City of Chicago LR 56.1, Ex. E, at 23. However, even when construing these facts in the light most favorable to the Estate, there is still no evidence that shows any of these Defendants intended for Bradich to die or suffer grievously or were indifferent to his serious medical need. See Salazar, 940 F2d. at 238.

Plaintiff's arguments based on evidence tampering and cover-ups also fail to raise a genuine issue of material fact. They are either irrelevant to our inquiry or unsupported by the record. For example, whether the decedent used his shirt, shoelaces or belt as a ligature is irrelevant to this issue of whether the Defendants provided Bradich with prompt medical assistance. Also, the Estate's claim that Captain Hilbring lied to investigators about Simmons using life saving techniques on

15

Bradich is unfounded. Plaintiff misconstrues the evidence as a statement meaning that Simmons gave Bradich cardio-pulmonary resuscitation ("C.P.R."). However, Captain Hilbring told investigators that Officer Simmons attempted to revive Bradich after he was released from his ligature. This is consistent with Simmons and Walker's testimony that Simmons slapped and yelled at Bradich in an effort to revive him. Furthermore, the fact that each Defendant could not remember exactly what happened or exactly what time these traumatic events occurred is not material. What is material is that each Defendant's account of the incident shows that these officials worked diligently to free Melvin Bradich from his ligature and to summon medical assistance.

Therefore, the Estate has failed to show that Captain Hilbring, Officer Simmons or Detention Aide Walker were deliberately indifferent to Melvin Bradich's serious medical needs after discovering him hanging in his cell. Absent such showing, the court need not consider the second prong of these individual Defendants' qualified immunity defense. See Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001). As a result, Hilbring, Simmons and Walker are entitled to summary judgment on the Estate's § 1983 claims.

## C. The Estate' Claims against the City of Chicago

To prevail against a municipality under § 1983, a plaintiff must show that "'deliberate action attributable to the municipality directly caused the deprivation of federal rights.'" Frake v. City of Chicago, 210 F.3d 779, 781 (7th Cir. 2000) (quoting Board of County Comm'rs v. Brown, 520 U.S. 397, 415 (1997)). When the plaintiff's claims against the municipality are premised only on the fact that the municipality's policies and practices caused the individual defendants to violate the plaintiff's Constitutional rights, and the court determines that no such violation has occurred, there

can be no § 1983 liability against the municipality. Collignon v. Milwaukee County, 163 F.3d 982, 990-91 (7th Cir. 1998).

In this case, Counts I and II of the Estate's Second Amended Complaint allege violations of § 1983 against the City. Both claims allege that the City's policies, practices and customs caused the individual Defendants to violate Melvin Bradich's Fourteenth Amendment due process rights. See Second Am. Compl. ¶¶ 1-84. Because the court has determined that no individual Defendant violated Bradich's due process rights in this case,[5] the City cannot be held liable under § 1983. See Collignon, 163 F.3d at 990-91.

**D. The Estate's State Law Claims**

When the court dismisses all federal claims before trial, the usual course of conduct is to remand the state claims to the state court unless there are countervailing considerations. See Wright v. Associated Ins. Cos., Inc., 29 F.3d 1244, 1251 (7th Cir. 1994). Having dismissed all of the federal claims, the court relinquishes pendant jurisdiction over any and all of the Estate's state tort claims. See 28 U.S.C. § 1367; see also ISI Intern., Inc. v. Borden Ladner Gervais LLP, 316 F.3d 731, 733 (7th Cir. 2003); Gonzalez v. City of Chicago, 239 F.3d 939, 942 (7th Cir. 2001).

---

[5]The Estate also contends that unnamed firefighters violated Melvin Bradich's due process rights by failing to give him C.P.R. prior to the arrival of the paramedics. However, the Estate offers no evidence which would allow the court to draw a reasonable inference on this issue. Although the evidence shows that firefighters arrived before the paramedics and that they were not administering C.P.R. when the paramedics entered the cell, this alone is not enough to show that these firefighters acted with deliberate indifference. See Murphy, 176 F.3d at 938 (speculation, without evidentiary support, will not defeat a motion for summary judgment).

## IV. CONCLUSION

For the foregoing reasons, both the Individual Defendants' and the City's Motions for Summary Judgment are granted in part and denied in part; and Plaintiff's Motion for Partial Summary Judgment is denied as moot.

IT IS SO ORDERED.

_Charles R. Norgle_
Charles R. Norgle, District Judge
United States District Court

DATED: 2/17/04